FILED

FEB 0 7 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JENNIFER McKINNEY on behalf of
KENNETH McKINNEY,

        Plaintiff,

                                  CV 09-6348-PK

                                  FINDINGS AND
v.                                 RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

PAPAK, Magistrate Judge:

      Plaintiff Jennifer McKinney ("Jennifer"), acting on behalf of her deceased father, Kenneth

McKinney ("Kenneth"), filed this action December 11, 2009, seeking judicial review of the

Commissioner of Social Security's final decision denying Kenneth's application for disability

insurance benefits ("DIB") under Title II of the Social Security Act (the "Act") for the period

from September 9, 2003, through December 31, 2004. This court has jurisdiction over plaintiff's

Page 1 - FINDINGS AND RECOMMENDATION

action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

Plaintiff argues that the Commissioner failed properly to assess Kenneth's residual functional capacity after completing step three of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits, and failed to carry his burden at step five of the process. I have considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, this action should be remanded to the Commissioner for further administrative proceedings consistent with this opinion.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 404.1520(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). Otherwise, the evaluation will proceed to the second step.

Page 2 - FINDINGS AND RECOMMENDATION

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical

and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the

claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a); *see also* S.S.R. No. 96-8p, 1996 SSR

LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the

claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§

404.1520(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can

still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*,

482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f). In the event the claimant

is no longer capable of performing his or her past relevant work, the evaluation will proceed to

the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical

impairments to sedentary or light work must be found disabled, depending on their age and

vocational education level. 20 C.F.R. § 404, Subpt. P, App. 2. The so-called "grids" contained

in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining

whether such a nondiscretionary finding must be made. In the event the grids do not mandate a

finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and

work experience to determine whether the claimant can perform any jobs that exist in significant

numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§

404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. If the Commissioner meets his burden

to demonstrate that the claimant is capable of performing jobs existing in significant numbers in

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an
equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482

U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. A

claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the

fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied

proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193

(9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to

support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing*

*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports

and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v.*

*Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir.

2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's

interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible

[of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

# BACKGROUND

Kenneth was born November 22, 1955. Tr. 286-287.[2]  He earned a GED in 1974, and subsequently underwent four years training in an electrical apprenticeship program, culminating in his licensure as a journeyman electrician. Tr. 67, 163, 306. He has worked in the past in tire sales and repair, as a service station attendant, as an auto mechanic, as a machinist, as a groundskeeper for a mobile home park, as an electrician, as an in-house supervisor for a homeless shelter, and as a Department of Motor Vehicles customer service representative and drive examiner. Tr. 61-68, 69-76.

In the late 1990s, Kenneth applied for disability insurance benefits, alleging a disability onset date of April 1, 1998. Tr. 334. His application was denied by an Administrative Law Judge on September 8, 2003. Tr. 334. That ALJ decision was affirmed by the Social Security Administration's Appeals Council on July 2, 2004. Tr. 334. Plaintiff does not seek judicial review of the ALJ decision of September 8, 2003, and no party has offered any argument or evidence to suggest that the decision of September 8, 2003, should be disturbed.

On January 30, 2004, Kenneth protectively filed an application for both Title II disability insurance benefits and Title XVI Social Security insurance benefits,[3] alleging a disability onset date of May 3, 2001.[4]  Tr. 286-287. Kenneth described his allegedly disabling medical

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 12.

[3] For reasons set forth below, Kenneth's Title XVI SSI application is not within the scope of this court's review.

[4] At a hearing before an Administrative Law Judge on December 21, 2005, Kenneth agreed to amend his disability onset date to September 9, 2003, the day following the Commissioner's previous finding of no disability. Tr. 305-306.

Page 6 - FINDINGS AND RECOMMENDATION

conditions as "Back injury, arthritis, depression, ankle injury," Tr. 61, asserting that these

conditions limited his ability to work as follows: "unable to walk, stand or sit very long;

antisocial; physically don't feel good because of diabetes and depression," Tr. 61-62. He asserted

that these conditions first began to bother him April 1, 1998, and left him unable to work as of

May 3, 2001.[5]  Tr. 62.

The earliest medical report appearing in the administrative record dates from January 13,

1997, at which time Kenneth was seen by Sean Green, M.D., for left upper extremity pain and

tingling. Tr. 297-302. Following Kenneth's examination by Dr. Green, no medical reports

appear in the administrative record until March 11, 2003, nearly two years after Kenneth's

originally alleged disability onset date of May 3, 2001. Tr. 209. On that date, Kenneth was seen

by Kasia Van Pett, M.D., at a pre-operative conference prior to pituitary tumor resection surgery

scheduled for the following day. Tr. 209. On April 18, 2003, Dr. Van Pett noted that Kenneth

was doing well following surgery, and confirmed that the resected tumor had been a pituitary

adenoma. Tr. 209. On May 20, 2003, a post-operative MRI showed that the resection surgery

had been successful, with no apparent complications. Tr. 209.

On August 20, 2003, Kenneth consulted for the first time with Douglas D. Bailey, M.D.,

complaining of chronic problems with social anxiety, diabetes, and arthritis in his knees and

lower back. Tr. 153-154. Dr. Bailey notes that Kenneth's history of chronic low-back·pain is

"documented well by [doctor] from Cottage Grove," Tr. 153, although the records constituting

that documentation are not a part of the administrative record, other than the single report from

---

[5] Kenneth was terminated from his position at the Department of Motor Vehicles effective May 2, 2001, as a result of his frequent absences from work due to back pain. Kenneth never worked again following his dismissal from the DMV job.

Page 7 - FINDINGS AND RECOMMENDATION

Dr. Green. Dr. Bailey changed Kenneth's anxiety medications, continued his diabetes medications, and prescribed Vicodin for Kenneth's pain symptoms. Tr. 153.

Kenneth next consulted with Dr. Bailey on September 24, 2003, for depression, diabetes, and lower back pain. Tr. 153. At that consultation, Kenneth reported great improvement in his depression symptoms following the change in his medications, better control over his diabetes symptoms, and hope that his back pain would soon "stabilize[]." Tr. 153.

On October 19, 2003, Kenneth checked himself into a hospital having found that his blood sugar levels were unacceptably high according to a self-administered test. Tr. 142-148. He reported having run out of diabetes medication approximately ten days previously. Tr. 143. Dr. Bailey provided Kenneth with a refill of his medications and authorized his discharge from the hospital October 20, 2003. Tr. 144. Two days later, on October 22, 2003, Dr. Bailey saw Kenneth again to examine a lump in Kenneth's umbilical region. Tr. 150. Dr. Bailey opined that the lump was an "easily reducible" umbilical hernia, and prescribed medication. Tr. 150.

On January 20, 2004, Kenneth applied for disability insurance benefits and social security income. Tr. 286-287. On April 21, 2004, the Disability Determination Service referred Kenneth to David Northway, Ph.D., for a psychodiagnostic assessment, the scope of which chiefly related to Kenneth's claimed social phobia. Tr. 162-167. Kenneth reported to Dr. Northway that he had a history of drug and alcohol abuse, but had stopped using drugs in the late 1980's and stopped drinking alcohol in October 2003. Tr. 164, 166. Kenneth further reported to Dr. Northway that his sleep was irregular, that he experienced back pain at a level of 4-5 on a ten-point scale with an overall pain rating of 5-6 when his ankle, knee, and shoulder pain was taken into account, and that he experienced panic attacks approximately every third time he left his home. Tr. 164-165.

Dr. Northway recorded his observations that Kenneth presented with slightly flat affect and noticeable irritability, and opined that, "[b]ased on informal mental status testing," Kenneth "would have some difficulty learning, understanding, and remembering new information, particularly if the information were complex in nature," and that "he appears moderately to severely depressed and mildly to moderately anxious." Tr. 166. Dr. Northway further opined that Kenneth was capable of performing most activities of daily living, including shopping for food, getting around town by bus, and cooking. Tr. 166-167. Dr. Northway diagnosed Kenneth with severe, recurrent major depressive disorder, alcohol dependence in apparent early full remission, and anxiety disorder (not otherwise specified) with panic attacks and some symptoms of posttraumatic stress disorder. Tr. 167.

On May 14, 2004, the Administration referred Kenneth to Karen Bates-Smith, Ph.D., for an assessment of his mental residual functional capacity. Tr. 168-171. Dr. Bates-Smith found no significant limitations in Kenneth's understanding and memory, moderate limitations in his ability to work in coordination with or proximity to others without being distracted by them, and otherwise no significant limitations in sustained concentration and persistence. Tr. 168-169. She further found that Kenneth had a moderate limitation in his ability to interact appropriately with the general public and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and otherwise no significant limitation in social interaction ability. Tr. 169-170. She further found that Kenneth had no significant limitation in adaptation ability. Tr. 170. Dr. Bates-Smith concluded that Kenneth "exhibits no significant limitations in comprehension or memory. He is able to organize and direct his activities and can carry out both simple and more complex tasks on an independent basis. . . . He will be able to maintain a

Page 9 - FINDINGS AND RECOMMENDATION

regular work week. His memory is unaffected. . . . [He] would perform best w[ith]o[ut] interaction w[ith] public." Tr. 171.

On that same day, May 14, 2004, the Administration referred Kenneth to Martin Lahr, M.D., for an assessment of his physical residual functional capacity. Tr. 172-177. Dr. Lahr found that Kenneth was capable of occasionally lifting and/or carrying 20 lbs and frequently lifting and/or carrying 10 lbs, of standing and/or walking 2-3 hours in an 8-hour workday, and of sitting about 6 hours in an 8-hour workday, with no limitations on his ability to push and/or pull. Tr. 173. Dr. Lahr further found that Kenneth had occasional limitations in climbing, stooping, kneeling, crouching, and crawling, with frequent limitations in balancing but no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. Tr. 174-175. Dr. Lahr opined that Kenneth's reported pain symptoms were caused by a medically determinable impairment but were disproportionate to the expected severity of his determinable impairments, concluding on that basis that Kenneth was only "partially credible" in his report of disabling pain. Tr. 175-177. Dr. Lahr assessed Kenneth as capable of performing light work. Tr. 177. The Administration denied Kenneth's application for benefits that same day, finding him not disabled. Kenneth timely requested reconsideration of the adverse decision.

On May 24, 2004, Kenneth reported to a hospital emergency room with left upper extremity pain, where he was seen by Gary Halvorson, M.D. Tr. 194-201. Dr. Halvorson prescribed ice, stretching, and pain medication. Tr. 196. On June 9, 2004, Kenneth filled out a Disability Report in connection with his application for benefits in which he reported "Pain radiating in left shoulder and arm" as a new symptom arising since his last disability report. Tr. 101-107.

Page 10 - FINDINGS AND RECOMMENDATION

In a Claimant Pain Questionnaire of June 25, 2004, Tr. 115-117, Kenneth described his pain symptoms as "Burning, aching, sharp stinging pain" located in his "Lower Left Back, left leg, right ankle, knees, left shoulder, neck, left arm, elbow, wrist" with "numbness in left fingers," Tr. 115. Kenneth described these pain symptoms as present "all the time" and as lasting "Days, Weeks, Months." Tr. 115. Kenneth reported that "Sometimes Medication helps, Sometimes changeing [sic] positions helps." Tr. 115. In an Activities of Daily Living and Socialization report of that same date, Tr. 108-114, Kenneth reported a need for assistance with taking medications and attending medical appointments, Tr. 108, and that performing household chores was difficult for him due to pain, Tr. 109. Kenneth reported that he was unable to "stand, bend or walk very much without major pain." Tr. 112.

On June 26, 2004, Kenneth's mother, Lorene Crapser, filled out a third-party Function Report for Kenneth. Tr. 118-126. In response to the question, "What was [Kenneth] able to do before his[] illnesses, injuries, or conditions that he[] can't do now?" Crapser responded that Kenneth was no longer able to do "everything, anything he wanted too [sic]." Tr. 119. She further stated that Kenneth was unable to sleep due to pain symptoms, Tr. 119, that he was unable to perform indoor and outdoor household chores, Tr, 120, and that he "very seldom" left his home, Tr. 121. She asserted that Kenneth"s pain symptoms affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, see, remember, climb stairs, complete tasks, and concentrate. Tr. 123. Crapser concluded her rport with the remarks that Kenneth [is unable to do the things he used to do[;] he seems depressed[,] has lots of pain and is withdrawn." Tr. 125.

Kenneth consulted with Dr. Bailey again on July 19, 2004, complaining of arm pain and numbness. Tr. 251. Dr. Bailey described Kenneth as being in "modest distress" due to pain,

made arrangements to refer Kenneth to an imaging specialist for an MRI scan. Tr. 251. Kenneth

returned to Dr. Bailey's office on August 5, 2004, for a consultation regarding his diabetes,

hyprtension, and hypercholesterolemia, before his scheduled MRI had taken place. Tr. 250. Dr.

Bailey described Kenneth as in "no acute distress" due to pain at that consultation. Tr. 250.

On August 12, 2004, Kenneth underwent MRI scanning with Gregery Kienzle, M.D. Tr.

261-264, 266-267. According to Dr. Kienzle's report, an MRI of Kenneth's cervical spine

revealed multilevel degenerative changes (loss of normal disc space height and hydration), most

marked at the C4-5, C5-6, and C6-7 levels, with loss of normal cervical lordosis and mild

kyphosis from C4 to C6. Tr. 261, 261-262. Dr. Kienzle reported mild central spinal stenosis

present from C4 to C6, and a suggestion of some increased signal intensity within the spinal cord

at C4 to C6. Tr. 261, 262. Dr. Kienzle further reported finding discogenic disease and

osteophyte complex extending both to the right and left of the midline at the C4-5, C5-6, and

C6-7 levels, resulting in foraminal stenosis of moderate to severe degree bilaterally at C4-5 and

C5-6, particularly on the right at C5-6. Tr. 261. An MRI scan of Kenneth's brain showed stable

appearance, with no evidence of new or progressive pituitary tumor growth. Tr. 266-267.

The following day, August 13, 2004, Kenneth consulted with Dr. Van Pett for an annual

follow-up for his resection surgery. Tr. 238. Dr. Van Pett opined that no complications from the

surgery were present. Tr. 238. On the basis of Dr. Kienzle's radiologic report, Dr. Van Pett

recommended that Kenneth undergo an anterior discectomy and fusion at the C4/5 and C5/6

levels. Tr. 203-207. She performed that procedure approximately one week later, on August 19,

2004. Tr. 212-218.

On August 23, 2004, the Administration declined to disturb its previous denial of

Kenneth's application for benefits. Kenneth timely requested a hearing by an Administrative

Law Judge to review the Administration's adverse decision.

Kenneth consulted with Dr. Bailey on September 2, 2004, complaining of sleep apnea

and neck and low back pain. Tr. 249. At that consultation, Kenneth reported that his pain

symptoms were much improved following his recent surgery. Tr. 249. Dr. Bailey ordered an

overnight study to investigate Kenneth's sleep apnea symptoms. Tr. 249.

On September 20, 2004, Kenneth filled out a Disability Report in connection with his

application for benefits in which he reported "major Pain in Neck, Left Shoulder, arm and finger"

and "Back pain when Sitting, Walking, Standing" as new symptoms arising since his last

disability report. Tr. 129-139.

On September 23, 2004, Kenneth checked in for an overnight study of his sleep apnea

complaints. Tr. 252-260. According to the study results, Kenneth's sleep was interrupted by

numerous significant "desaturation events" in which his blood oxygen levels dropped below

healthy levels. Tr. 252-260.

Kenneth presented to Dr. Van Pett for a post-surgery follow-up on September 24, 2004.

Tr. 236. At that appointment, Kenneth reported to Dr. Pett that he was off all his pain

medications, and that absent some soreness in his neck from the surgery he had no other pain-

related issues. Tr. 236. An X-ray study of September 24, 2004, showed "good alignment" of

Kenneth's cervical spine. Tr. 240.

Kenneth consulted with Dr. Bailey on September 30, 2004, in connection with his

diabetes, Tr. 248, and on October 28, 2004, in connection with his diabetes, sleep apnea, and low

back pain, Tr. 247. On November 11, 2004, at Dr. Bailey's request, Kenneth underwent an

Page 13 - FINDINGS AND RECOMMENDATION

overnight sleep study with Robert Tearse, M.D., in connection with his sleep apnea. Tr. 231-234. Dr. Tearse concluded that Kenneth's apnea was "likely to be moderate with REM related hypoxia," and recommended that Kenneth try using a Continuous Positive Airway Pressure machine to ease his apnea symptoms. Tr. 232.

On November 15, 2004, in response to a letter from Kenneth's attorney, Dr. Bailey opined that Kenneth suffered from "low back pain, diabetes, sleep apnea with daytime somnolence, morbid obesity, hypertension" and that claimant would be unable to perform a full range of sedentary work and unable to sustain sedentary work on a full-time basis due to being "too drowsy" as a result of sleep apnea and because "sitting increases disc pressure, increasing pain." Tr. 228-229. Dr. Bailey saw Kenneth for diabetes and low back pain again on November 22, 2004. Tr. 246.

On December 3, 2004, Kenneth consulted with Dr. Bailey complaining (for the first time) of radicular neck pain. Tr. 245. Dr. Bailey saw Kenneth again on December 9, 2004, for the same complaint, and on that date described Kenneth as being in "a lot of distress" due to pain symptoms. Tr. 244.

On December 12, 2004, Kenneth underwent another overnight study with Dr. Tearse, in connection with his sleep apnea symptoms. Tr. 271. Dr. Tearse opined that "[m]oderate sleep disturbance is indicated by the sleep efficiency, number of arousals, and sleep architecture. He still had normal amounts of REM and deep sleep. His reduced and late onset of REM sleep is probably due to medications." Tr. 271.

Dr. Bailey saw Kenneth again on December 20, 2004, characterizing him as in "minor distress" due to radicular neck pain. Tr. 243. Dr. Bailey prescribed physical therapy. Tr. 243.

Kenneth started a course of physical therapy with Michael Baum, P.T., on December 28, 2004. Tr. 237.

Kenneth's date last insured was December 31, 2004. In consequence, medical records dated 2005 or later are of relevance to plaintiff's request for judicial review only to the extent they bear upon Kenneth's impairments as of December 31, 2004, or earlier. In the discussion that follows, I therefore elide over medical records appearing in the record that appear to have no possible bearing on Kenneth's condition during the period for which he was insured.

On January 27, 2005, Kenneth underwent another MRI scan of his cervical spine. Tr. 239. That imaging study found no abnormal motion in neutral, flexion, and extension views, good incorporation of intervertebral disc material, no fracture or subluxation, intact posterior elements, no focal swelling, and no abnormalities at the atlantoaxial region.. Tr. 239.

On June 28, 2005, Don Remschel, P.T., evaluated Kenneth as able to sit, stand, perform elevated work while standing, climb stairs, repetitively squat, walk, and rotate trunk while standing occasionally, and unable to perform lowered work while standing, crawl, climb ladders, and rotate trunk while sitting. Tr. 274. Remschel assessed Kenneth's cervical range of motion at 16 degrees flexion, 20 degrees extension, right side-bending at 12 degrees, left side-bending at 16 degrees, right rotation at 36 degrees, and left rotation at 32 degrees. Tr. 2734. Remschel opined that Kenneth was able to perform light work, with no major areas of dysfunction; Remschel expressed no opinion as to Kenneth's ability to tolerate an 8-hour work day. Tr. 273.

On September 13, 2005, Dr. Bailey opined, without particularity, that Kenneth was "disabled." Tr. 285.

On December 21, 2005, a hearing was held before an ALJ. Tr. 303-324. At that hearing,

Page 15 - FINDINGS AND RECOMMENDATION

Kenneth agreed through his counsel to amend his alleged disability onset date to September 9, 2003, the date of the next day following the Administration's decision denying Kenneth's previous application for benefits and finding him not disabled as of September 8, 2003. Tr. 305-306. Approximately five months later, on May 25, 2006, the ALJ denied Kenneth's applications for DIB and SSI benefits. Tr. 15-23, 13-14. Kenneth timely requested review of the ALJ's decision, and the Appeals Council denied his request on July 14, 2006. Tr. 7-10. Kenneth obtained judicial review of the Commissioner's final decision denying his application, and, on July 17, 2006, by the stipulation of the parties, Judge Coffin remanded the case back to the Administration for further proceedings. Tr. 351-358. On April 30, 2007, in connection with Kenneth's Title XVI application for SSI benefits, the Appeals Council determined that Kenneth was disabled as of June 5, 2006. Tr. 335. However, in connection with Kenneth's Title II DIB application, the Appeals Council remanded the case back to the ALJ on October 4, 2007, with instructions to consider specified evidence that the ALJ had previously omitted to consider. Tr. 359-367.

Kenneth died of natural causes on January 26, 2008. Tr. 382. No autopsy was performed. Jennifer substituted for Kenneth as the party in interest for purposes of these proceedings on January 31, 2008. Tr. 368.

On June 9, 2008, a second hearing was held before the ALJ. Tr. 478-501. At this second hearing, the ALJ heard testimony from Jennifer, Tr. 481-488, and a vocational expert, Tr. 488-500. Approximately three months later, on August 22, 2008, the ALJ issued a decision affirming the Commissioner's previous denial of Kenneth's application for benefits. Tr. 334-348, 331-333. The ALJ determined that, because Kenneth's date last insured was December 31, 2004, and his

amended alleged disability onset date was September 9, 2003, the relevant time period for

consideration of Kenneth's application for benefits was limited to September 9, 2003, through

December 31, 2004. Tr. 335. In addition, because Kenneth was deceased and had no surviving

spouse at any time during the relevant time period, the ALJ determined that establishment of

disability for purposes of Title XVI SSI benefits would be without practical effect, *see* 20 C.F.R.

416.542(b), and therefore ALJ limited the scope of her adjudication to Kenneth's Title II DIB

application only. Tr. 335. Plaintiff does not contest this determination. Tr. 483-484. For

purposes of Kenneth's DIB application, the ALJ found Kenneth not disabled at any time between

September 9, 2003, and December 31, 2004. Tr. 336.

Plaintiff timely requested review of the ALJ's decision, and on October 13, 2009, the

Appeals Council declined the request. Tr. 325-327. In consequence, the ALJ's decision of

August 22, 2008, became the agency's final order for purposes of judicial review. *See* 20 C.F.R.

§ 422.210(a); *see also, e.g., Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law

Judge found in her August 22, 2008, opinion that Kenneth did not engage in substantial gainful

activity at any time following his alleged disability onset date (as amended) of September 9,

2003. Tr. 338. She therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Kenneth's medical impairments of diabetes, low

back pain, ankle pain, cervical radiculopathy and spinal cord edema, cervical degenerative

disease, cervical spine fusion, sleep apnea, depression, and anxiety were "severe" for purposes of

the Act. Tr. 338-339. Because the combination of impairments was deemed severe, the ALJ

Page 17 - FINDINGS AND RECOMMENDATION

properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Kenneth's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 339-342. The ALJ therefore properly conducted an assessment of Kenneth's residual functional capacity. Specifically, the ALJ found that during the relevant adjudication period Kenneth had:

> the residual functional capacity to lift or carry 10 pounds frequently or occasionally; [and] was limited to 30 minutes of continuous standing on his feet or a total of two to three hours in a day; there was to be no intense interpersonal relationships; no rapid head movements; he required a change in position, briefly, if he was sitting every half hour to hour; he could sit up to eight hours in a day; he could not perform work requiring prolonged fixed head positions; and there was to be no forceful gripping of the left hand. . . .

Tr. 342. In reaching these conclusions, the ALJ considered all of the objective medical evidence in the record, as well as Kenneth's own statements and those of his mother and daughter as to his ability to perform the activities of daily living, the frequency and intensity of his pain and other symptoms, and the efficacy both of medical treatment and of other measures taken to alleviate his symptoms. Tr. 342-346.

At the fourth step of the five-step process, the ALJ found in light of his RFC that Kenneth was unable to perform his past relevant work. Tr. 346.

At the fifth step, the ALJ found in light of Kenneth's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that he could perform. Tr. 347-348. Relying in part on the testimony of an objective vocational expert, the ALJ cited as examples of unskilled, sedentary jobs that Kenneth could perform despite the limitations listed in his RFC occupations including information clerk (80,000 jobs in the national economy and 500-600 jobs in the Oregon economy). Tr. 347. Based on the finding

Page 18 - FINDINGS AND RECOMMENDATION

that Kenneth could have performed jobs existing in significant numbers in the national economy, the ALJ concluded that he was not disabled as defined in the Act at any time between September 9, 2003, and December 31, 2004.  Tr. 348.

## ANALYSIS

Plaintiff challenges the Commissioner's assessment of his residual functional capacity. Specifically, plaintiff argues that the Administrative Law Judge improperly rejected the opinion of Kenneth's treating physician, Kenneth's own lay opinion testimony, and Jennifer's lay opinion testimony, and further erred in her consideration of Physical Therapist Don Remschel's evaluation of Kenneth's work capacity.  Plaintiff further argues that the Commissioner failed to carry his burden at the fifth step of the five-step process in light of the alleged errors in the ALJ's assessment of Kenneth's RFC.

## I.    Residual Functional Capacity

### A.    Opinion of Treating Physician Dr. Bailey

Douglas Bailey, M.D., was Kenneth's treating physician for diabetes, back and extremity pain, social anxiety, and other medical conditions from August 20, 2003, until shortly before Kenneth's death on January 26, 2008.  As noted above, on November 15, 2004, in response to a letter from Kenneth's attorney, Dr. Bailey opined that Kenneth suffered from "low back pain, diabetes, sleep apnea with daytime somnolence, morbid obesity, hypertension" and that claimant would be unable to perform a full range of sedentary work and unable to sustain sedentary work on a full-time basis due to being "too drowsy" as a result of sleep apnea and because "sitting increases disc pressure, increasing pain."  Tr. 228-229.  Plaintiff argues that the Administrative Law Judge improperly rejected Dr. Bailey's opinion of November 15, 2004.

In weighing a claimant's medical evidence, the Commissioner generally affords enhanced weight to the opinions of the claimant's treating physicians. *See* 20 C.F.R. § 404.1527(d)(2). Indeed, where a treating physician's medical opinion is well supported by diagnostic techniques and is not inconsistent with other substantial evidence in the medical record, the treating physician's opinion is accorded controlling weight. *See id.* Moreover, even where a treating physician's opinion is contradicted by competent medical evidence, it is still entitled to deference. *See id.*; *see also, e.g., Orn v. Astrue,* 495 F.3d 625, 631-632 (9th Cir. 2007) (where a treating physician's opinion is contradicted by medical evidence in the record it is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527"), *quoting* S.S.R. No. 96-2p, 1996 SSR LEXIS 9. In consequence, an uncontradicted treating physician's opinion may only be rejected for "clear and convincing" reasons supported by evidence in the record, and a contradicted treating physician's opinion may only be rejected for "specific and legitimate" reasons supported by evidence in the record. *See Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998), *citing Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995).

Notwithstanding the foregoing, no such deference is afforded a treating physician's opinion as to the ultimate issue of a claimant's disability or as to any other issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e); *see also* S.S.R. No. 96-5p, 1996 SSR LEXIS 2. However, medical opinions from a treating physician or any other source may not be simply ignored, even when they bear upon issues reserved to the Commissioner, but rather must be evaluated to determine the extent to which they are supported by evidence in the record. *See* S.S.R. No. 96-5p, 1996 SSR LEXIS 2. Nevertheless, although the Commissioner is required to evaluate every medical opinion, the Commissioner is only required to discuss "significant

Page 20 - FINDINGS AND RECOMMENDATION

probative evidence" in his detailed findings. *Vincent on behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984) (controverted medical opinion found to be neither significant nor probative), *quoting Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir. 1981).

As a preliminary matter, I note that Dr. Bailey's November 15, 2004, opinion that back pain would prevent Kenneth from performing a full range of sedentary work is contradicted at least in part by competent medical evidence of record, specifically examining physician Martin Lahr's May 14, 2004, opinion that Kenneth could sit about six hours and stand and/or walk about two to three hours in an eight hour work day, Tr. 173. Similarly, his November 15, 2004, opinion that daytime drowsiness would prevent Kenneth from sustaining full-time sedentary work is contradicted at least in part by competent medical evidence of record, including Dr. Tearse's findings from the overnight sleep study of December 12, 2004, that the disturbance of Kenneth's sleep caused by sleep apnea was only "moderate," and that despite apnea-related interruptions Kenneth experienced "normal amounts of REM and deep sleep," Tr. 271. I therefore conclude that the ALJ was required to provide specific and legitimate reasons supported by evidence of record in order properly to reject Dr. Bailey's medical opinion of November 15, 2004.[6]

In her August 22, 2008, decision, the ALJ indicated that she accepted and credited Dr. Bailey's November 15, 2004, opinion as to Kenneth's diagnoses and symptoms. Tr. 345. However, she rejected Dr. Bailey's opinion that, as a result of his medical conditions, Kenneth

---

[6] Plaintiff is silent as to the applicable standard the ALJ was required to meet for rejecting Dr. Bailey's opinion, arguing only that the proffered reasons were "inadequate." Plaintiff's Brief at 16. The Commissioner, while not precisely silent as to the applicable standard, states equally unhelpfully that "[t]he ALJ properly [*sic*] clear and convincing, and specific and legitimate reasons to rejection [*sic*] Dr. Bailey's opinions." Defendant's Brief at 10.

would be unable to perform a full range of sedentary work and unable to sustain sedentary work on a full-time basis. Tr. 345. The ALJ rejected Dr. Bailey's conclusion in part because Dr. Bailey's opinion letter did not include information regarding how long Kenneth's symptoms were expected to endure, whether the impairments could be ameliorated through treatment, or whether the impairments could be accommodated in such a way as to permit Kenneth to perform and sustain a full range of sedentary work. Tr. 345. The Commissioner concedes that, to the extent the ALJ relied on Dr. Bailey's failure to provide the specified information as a reason for rejecting his opinion, the ALJ clearly erred. It is well settled that where a treating physician's medical report does not contain all information necessary to support a disability determination, an ALJ may not reject the treating physician's opinion without first contacting that physician to request clarification or additional evidence or information. *See* 20 C.F.R. § 404.1512(e).

In further support of her rejection of Dr. Bailey's opinion that Kenneth's back pain would prevent him from performing a full range of sedentary work, the ALJ additionally noted that Kenneth's medical records do not indicate that Kenneth reported specific problems with sitting to his medical care providers during the period between September 9, 2003, and December 31, 2004. Tr. 345. In addition, she noted that Jennifer provided testimony (Tr. 485-486) that Kenneth normally spent much of his time alternating between sitting in a recliner-type chair and sitting in an office-type chair, suggesting that Kenneth was able to sit for extended periods of time if permitted to change positions. Tr. 345. The ALJ acknowledged that Kenneth's reported back pain symptoms would prevent him from sitting for long periods in the absence of any opportunity to change positions, but rejected Dr. Bailey's opinion to the extent it embraced the proposition that Kenneth's back pain would prevent him from sitting up to eight hours per day

Page 22 - FINDINGS AND RECOMMENDATION

even with the opportunity to change positions as needed. Tr. 345.

While the ALJ is to be faulted for her failure to seek clarification or additional

information regarding Kenneth's sitting-related limitations, her failure to do so constituted

harmless error in light of her additional stated reasons for rejecting Dr. Bailey's opinion, which

are specific, legitimate, and supported by medical evidence of record. *See Burch v. Barnhart*,

400 F.3d 676, 679 (9th Cir. 2005) ("[a] decision of the ALJ will not be reversed for errors that

are harmless"), *citing Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991). While it is true

that a recliner may be used to achieve a supine or recumbent rather than sedentary position,

Jennifer specified in her testimony that rather than lying in his recliner Kenneth "sat up in it,"

using pillows "to prop him up a little more." Tr. 486. It therefore appears from Jennifer's

testimony that Kenneth habitually spent a large proportion of his waking hours, apparently well

in excess of eight hours per day, in a sedentary position. The ALJ did not err in relying on

Jennifer's testimony to reject Dr. Bailey's opinion that Kenneth's back pain would prevent him

from occupying a sedentary position during an eight-hour work day.

In support of her rejection of Dr. Bailey's opinion that daytime drowsiness resulting from

sleep apnea would prevent him from sustaining sedentary work on a full-time basis, the ALJ

noted medical records dating from January 2005 through August 2005 indicating that Kenneth

experienced only moderate fatigue in consequence of his sleep apnea, and that he did not

regularly use the bilevel Continuous Positive Airway Pressure machine that he had been

prescribed. Tr. 345. On the basis of these 2005 records, the ALJ expressed herself "not

persuaded" that Kenneth's drowsiness symptoms were "at an intensity for a twelve month

consecutive period" that would prevent him from sustaining full-time sedentary work. Tr. 346.

Page 23 - FINDINGS AND RECOMMENDATION

Although the ALJ elsewhere discussed Kenneth's overnight sleep study of November 11, 2004,

Tr. 339, in no connection did she discuss or reference Kenneth's April 21, 2004, report to Dr.

Northway that his sleep was "irregular," that he frequently woke up during the night due to pain,

and that he frequently was unable to return to sleep after being so awakened, Tr. 164, his

September 2, 2004, complaint of sleep apnea to Dr. Bailey, in connection with which he reported

that his sleep apnea symptoms were by that time already of long standing, Tr. 249, the overnight

sleep study Kenneth underwent on September 23, 2004, to investigate his sleep apnea symptoms,

Tr. 252-260, or the sleep study of December 12, 2004, in connection with which Dr. Tearse

opined that the disturbance of Kenneth's sleep caused by sleep apnea was only "moderate," and

that, despite apnea-related interruptions, Kenneth experienced "normal amounts of REM and

deep sleep," Tr. 271.

The ALJ's proffered reasons for rejecting Dr. Bailey's opinion that daytime drowsiness

would prevent Kenneth from sustaining sedentary work on a full-time basis cannot be construed

as legitimate in light of the extensive evidence the ALJ omitted to consider and of the fact that

the evidence the ALJ chiefly relied upon related specifically to the intensity of Kenneth's

symptoms at a time subsequent to his date last insured.  Indeed, the ALJ appears to have tacitly

relied upon the demonstrably incorrect assumption that Kenneth's apnea condition arose for the

first time in November 2004 when she concluded from the 2005 findings of only moderate sleep

deprivation that Kenneth's symptoms were not sufficiently "intens[e]" over a twelve-month

period to support a finding of significant impairment.  To the contrary, the record clearly

establishes that Kenneth was reporting frequent sleep disturbance to health-care providers by not

later than April 2004, and strongly suggests that his apnea symptoms first arose still earlier.

Had the ALJ discussed and relied upon, for example, Dr. Tearse's December 12, 2004, finding that Kenneth experienced only moderate sleep disturbance that did not prevent him from getting "normal amounts" of REM and deep sleep, I would have had no difficulty in concluding that Dr. Tearse's findings constituted a legitimate reason for rejecting Dr. Bailey's opinion. However, the ALJ did not do so. Moreover, it would be clearly inappropriate for me to construe her failure to do so as harmless error, as it is the ALJ's burden, and not the court's, to provide specific and legitimate reasons for rejecting a treating physician's medical opinion. The courts are constrained to review the reasons actually asserted by the ALJ, and may not undertake to identify additional reasons that could have been advanced by the ALJ, but were not. *See Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006), *citing Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). Moreover, the courts may not affirm the Commissioner's decision on grounds the Commissioner omitted to invoke in making his decision. *See id., quoting Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001). Under such circumstances, applicable Ninth Circuit jurisprudence clearly establishes that it would be reversible error to invoke the harmless error doctrine. *See id.* at 1056-1057.

The ALJ improperly failed to provide specific, legitimate reasons for her decision to reject Dr. Bailey's opinion that apnea-related daytime drowsiness would have prevented Kenneth from sustaining full-time sedentary work. That opinion, if fully credited, would likely have mandated a finding that Kenneth was disabled within the meaning of the Act during the period from September 9, 2003, through December 31, 2004. Plaintiff's action should therefore be remanded to the Commissioner for further administrative proceedings consistent with the foregoing discussion.

Page 25 - FINDINGS AND RECOMMENDATION

**B.      Kenneth's Testimony**

At the hearing before the Administrative Law Judge on December 21, 2005, Kenneth testified that doing housework such as vacuuming the floor and washing dishes exacerbated his pain symptoms, causing his back, neck, and shoulders to hurt and his fingers to go numb. Tr. 310. He further testified that he was unable to perform such tasks without taking breaks to rest and to permit his pain symptoms to subside, with the result that it might take him an hour and a half to vacuum the floor of a small apartment, or three hours to clean his dishes. Tr. 310. Plaintiff argues that the ALJ improperly disregarded this testimony in finding that his "ability to wash dishes and perform other household tasks" suggested that he was able to perform work within the limits of his residual functional capacity, Tr. 346.

When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms. 20 C.F.R. § 404.1529. In the event the ALJ determines that the claimant's report is not credible, such determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*).

In weighing a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between h[is] testimony and h[is] conduct, claimant's daily activities, h[is] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which

Page 26 - FINDINGS AND RECOMMENDATION

claimant complains." *Id.* (internal modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792

(9th Cir. 1997). While a finding that a claimant lacks credibility cannot be premised solely on a

lack of medical support for the severity of his pain, *see Light*, 119 F.3d at 792, *citing Lester v.*

*Chater*, 81 F.3d 821, 834 (9th Cir. 1995), where the ALJ's credibility finding is supported by

substantial evidence in the record, the finding will not be disturbed, *Thomas*, 278 F.3d at 959,

*citing Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999).

     The ALJ's statement that "within the limitations assessed in the residual functional

capacity assessment, [Kenneth] could have performed work, as was suggested in [*sic*] ability to

wash dishes and perform other household tasks," Tr. 346, was by no means the only argument

adduced in support of the ALJ's assessment of Kenneth's residual functional capacity; indeed, it

is not clear that the statement was intended other than illustratively. Moreover, the ALJ took

express note of evidence that Kenneth was "very limited in his ability to function around the

house due to pain," Tr. 346, but that he was nevertheless able to prepare his own meals regularly,

and to travel by bus to attend medical appointments and to perform household errands such as

grocery shopping. Tr. 346. The ALJ's statement that Kenneth's ability to perform "other

household tasks" (which would necessarily include the preparation of meals) is therefore not

clearly inconsistent with Kenneth's testimony.

     To the extent the ALJ's assessment of Kenneth's residual functional capacity may be

inconsistent with Kenneth's hearing testimony, the ALJ provided specific and substantial reasons

for her findings, including the mental residual function capacity evaluation of May 14, 2004, the

psychodiagnostic assessment of April 21, 2004, the absence of complaints of neck, upper back,

or upper extremity pain prior to May 2004 in combination with Kenneth's report to Dr. Van Pett

of September 2, 2004, that his pain issues were "pretty much resolved," and the June 28, 2005,

physical capacity evaluation.  Elsewhere, the ALJ further discussed the physical residual capacity

evaluation of may 14, 2004, as well.  The Commissioner's decision therefore should not be

disturbed on the basis of the ALJ's partial disregard of Kenneth's December 21, 2005, hearing

testimony.

C.    **Jennifer's Testimony**

At the hearing before the Administrative Law Judge on June 9, 2008, Jennifer testified

that during 2004 she saw Kenneth approximately once per week, Tr. 482, that on those occasions

she would perform his housework for him as he was unable to do so himself, Tr. 482, that he was

visibly in pain, Tr. 484, and that he would spend the better part of his days alternating between

sitting in a recliner-type chair and sitting in an office-type chair, Tr. 485-486.  The ALJ discussed

Jennifer's testimony, and expressly found it credible except to the extent, if any, that it conflicted

with her assessment of Kenneth's residual functional capacity.  Tr. 342.  Plaintiff argues, without

specificity, that the ALJ's assessment of Kenneth's residual functional capacity constituted an

improper rejection of Jennifer's testimony.

"An ALJ need only give germane reasons for discrediting the testimony of lay witnesses."

*Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005), *citing Lewis v. Apfel*, 236 F.3d 503,

511 (9th Cir. 2001).  Inconsistency with medical evidence is considered a "germane" reason for

discrediting lay witness testimony.  *See id.*, *citing Lewis*, 236 F.3d at 511.

Here, to the extent the ALJ may have discredited portions of Jennifer's testimony, she

provided germane reasons for so doing that are supported by substantial evidence in the record.

Specifically, as discussed above, in making her findings regarding Kenneth's residual functional

capacity the ALJ provided reasons for her findings, including the mental residual function capacity evaluation of May 14, 2004, the psychodiagnostic assessment of April 21, 2004, the absence of complaints of neck, upper back, or upper extremity pain prior to May 2004 in combination with Kenneth's report to Dr. Van Pett of September 2, 2004, that his pain issues were "pretty much resolved," and the June 28, 2005, physical capacity evaluation. The Commissioner's decision therefore should not be disturbed on the basis of the ALJ's partial disregard, if any, of Jennifer's June 9, 2008, hearing testimony.

### D.    Opinion of Physical Therapist Remschel

On June 28, 2005, Kenneth was evaluated by physical therapist Dan Remschel. Tr. 273-279. Remschel evaluated Kenneth as able to sit, stand, perform elevated work while standing, climb stairs, repetitively squat, walk, and rotate trunk while standing occasionally, and unable to perform lowered work while standing, crawl, climb ladders, and rotate trunk while sitting. Tr. 274. Remschel assessed Kenneth's cervical range of motion at 16 degrees flexion, 20 degrees extension, right side-bending at 12 degrees, left side-bending at 16 degrees, right rotation at 36 degrees, and left rotation at 32 degrees. Tr. 274. Remschel opined that Kenneth was able to perform light work, with no major areas of dysfunction; Remschel expressed no opinion as to Kenneth's ability to tolerate an 8-hour work day, due in large part to Kenneth's decision not to perform 47% of the tasks required for the evaluation, because of neck pain. Tr. 273.

The ALJ expressly stated that she was "persuaded" by Remschel's findings, and viewed her assessment of Kenneth's residual functional capacity as "consistent" with Remschel's lay opinion testimony as to Kenneth's capacity. Tr. 344. However, it is clear that Remschel's evaluation incorporated a significantly stricter limitation than did the ALJ's assessment of

Kenneth's RFC:  whereas Remschel opined that Kenneth could only "occasionally" (up to one-third of a work day) sit, the ALJ assessed Kenneth as able to sit for an entire eight-hour work day, with opportunities to change positions every half hour to hour.

Although the ALJ clearly erred when she stated that her assessment of Kenneth's residual functional capacity was consistent with Remschel's evaluation, that error was harmless, in that her mistake was irrelevant to the ALJ's ultimate conclusion. *See Burch*, 400 F.3d at 679, *citing Curry*, 925 F.2d at 1131.  As noted above, the ALJ provided specific, legitimate reasons, supported by evidence of record, for concluding that Kenneth was able to sit for up to eight hours, if given the opportunity to change positions, including chiefly Jennifer's testimony that Kenneth spent the majority of his hours in a sedentary position.  In light of the support the ALJ adduced for her finding that Kenneth could perform sedentary work under those conditions, her mischaracterization of Remschel's evaluation as consistent with her assessment of Kenneth's RFC was necessarily harmless.  The Commissioner's decision therefore should not be disturbed on the basis of the ALJ's erroneous characterization of Remschel's lay opinion testimony.

II.    **Step Five:  Existence of Jobs the Claimant Could Perform in the National Economy**

As noted above, plaintiff argues that the Administrative Law Judge erred in rejecting Dr. Bailey's November 15, 2004, opinion, in disregarding portions of Kenneth's and Jennifer's testimony, and in her consideration of Remschel's lay opinion testimony as to Kenneth's physical capacities.  In consequence of these errors, plaintiff argues, the ALJ erred in her assessment of Kenneth's residual functional capacity.  On that basis, plaintiff argues that the Commissioner failed to meet his burden at the fifth step of the five-step process to demonstrate that, in light of his residual functional capacity, Kenneth was capable of performing jobs existing in significant numbers in the national economy.

Also as noted above, although plaintiff's arguments regarding Kenneth's, Jennifer's, and Remschel's lay opinion testimony are without merit, plaintiff is correct that the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Bailey's opinion, as she was required to do.  If Dr. Bailey's opinion had been fully credited, the resulting RFC would have included the limitation that Kenneth was unable to sustain sedentary work on a full-time basis, which would have precluded him from performing jobs existing in significant numbers in the national economy.  Nevertheless,

For the foregoing reasons, the Commissioner failed to meet his burden at the fifth step. Plaintiff's action should therefore be remanded to the Commissioner for further administrative proceedings.

## CONCLUSION

For the reasons set forth above, I recommend that this action be remanded to the Commissioner for further administrative proceedings consistent with this opinion.

Page 31 - FINDINGS AND RECOMMENDATION

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 7th day of February, 2011.

Honorable Paul Papak
United States Magistrate Judge